Ronald **CHANCELLOR**, Plaintiff,

v.

**L.J. HOOKER COMMERCIAL REAL ESTATE, INC.**, Defendant.

Civ. A. No. 86–3463.

United States District Court, District of Columbia.

June 30, 1988.

---

Robert F. Leibner, Washington, D.C., for plaintiff.

Christopher E. Hassell, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN GARRETT PENN, District Judge.

This case comes before the Court on defendant's motion for summary judgment and the opposition thereto. The facts of the case are set forth below.

### I

The parties entered into an employment contract ("the contract or agreement") in which plaintiff agreed to act as a real estate broker/salesperson for defendant and defendant agreed to pay plaintiff for his sales and brokerage activities on a commission basis. The matter presently before the Court involves brokerage services provided by plaintiff which resulted in the exclusive listing for Merrill Lynch[1] of property known as St. Cecilia's Academy ("St. Cecilia's"), located in the District of Columbia. Mr. Chancellor alleges that he obtained the exclusive listing through negotiation with the owners of the property and by putting together a brochure on the property. Plaintiff's Dep. at 33–4. Plaintiff stated further that he did "most of the work on the package" in response to questions regarding any assistance provided by another employee, George McConnell. *Id.* at 34.

The record before the Court indicates that by letter dated March 16, 1984, representatives of the defendant indicated that because of their efforts in securing an exclusive listing of St. Cecilia's, two employees, Ronald Chancellor and George McConnell, would be entitled to split 25% of the listing commission on the sale of St. Cecilia's. The language of the March 16, 1984 letter provides: "The following decision was reached with regards to commission split. Ronald Chancellor and George McConnell will, if and when they receive the executed listing agreement, be entitled to 25% of the listing commission. This commission will be shared between both agents. Reasons for this decision are: both agents are actively pursuing the execution of the listing and George is writing the proposal." The listing agreement was obtained from St. Cecilia's.

In July of 1984, plaintiff related that he ceased working regularly for defendant because he "spent a lot of time at the beach" in Rehobeth, Delaware. Plaintiff's Dep. at 8–9. During October of 1984, defendant sent a certified letter dated October 16, 1984, return receipt requested, terminating plaintiff's employment because of his absence from work. This certified letter was sent to plaintiff's District of Columbia address located on the first page of the contract.[2] It is undisputed that this certified

---

1. In the original complaint Merrill Lynch is named as the defendant, however the complaint has been amended to name L.J. Hooker, Merrill Lynch's successor in interest, as the defendant.

2. The address given on plaintiff's employment contract is 4511 Argyle Terrace, N.W., Washington, D.C. There is no indication in the record

letter was never claimed.[3] Additionally, defendant sent a copy of the termination letter via Federal Express to plaintiff at his residence in Delaware. Although plaintiff does recall receiving a letter sometime in October terminating his employment due to his failure to return to work, he cannot remember when he received the copy of the letter at his home in Rehobeth. *Id.* at 9–10.

At an unspecified time subsequent to his departure and termination from Merrill Lynch, Mr. Chancellor states that he contacted a managerial employee of the defendant, George Dewey. They discussed various transactions that plaintiff participated in during his employment with defendant. Mr. Chancellor contends that during his initial conversation with Mr. Dewey, it was indicated to him by Mr. Dewey that his commission as a result of the sale of St. Cecilia's was $18,000. Dep. at 15–9. According to plaintiff, there was no discussion as to how that figure was selected. *Id.* at 60. When plaintiff questioned Mr. Dewey regarding that particular figure, Mr. Dewey responded, "I can't tell you what happens through the deal." *Id.* at 61. He also asserts that because of his termination from the company, Mr. Dewey "was a little less able to talk" about the deal. *Id.* at 16.

In a later conversation it is alleged that Mr. Dewey telephoned him to report that George McConnell had requested arbitration of the part of the commission from the sale of St. Cecilia's that plaintiff and Mr. McConnell were to split. *Id.* at 18. Plaintiff was informed of the nature and date of this intra-company proceeding, including the procedure, namely that the company arbitrators would come down from Stan-

ford, listen to the case, and make their own decision. *Id.* at 58–9;62–3. Further he also understood that if Mr. McConnell received more money he would receive less. *Id.* at 62. Mr. Chancellor stated that he asked whether he should attend the arbitration and whether he should bring his attorney. *Id.* at 59. According to plaintiff, Mr. Dewey responded that such action was not necessary and there was nothing plaintiff could do to deny Mr. McConnell's right under the employment agreement to arbitrate. *Id.* at 58–9. Further, shortly before disbursement of the commission, Mr. Dewey called him and informed him of the result of these proceedings. *Id.* at 57. At that time plaintiff was advised by Mr. Dewey that the arbitrators held against him because he had not signed a pending deals list. *Id.* at 65.

Sometime after he received the news regarding the company arbitration, plaintiff brought this action against his former employer for breach of contract and in quantum meruit seeking an $18,000 commission which he claims defendant owes him. Defendant maintains that under the terms of the employment contract, plaintiff is not entitled to any recovery.

In its motion for summary judgment defendant contends that there is no genuine issue for trial, because plaintiff's employment contract bars his claims for three independent reasons. First, plaintiff's employment contract requires that he provide a transaction list of brokerage activities, from which any commission will be sought, within fifteen days of termination.[4] It is undisputed that plaintiff did not prepare such a list. Secondly, defendant contends

---

that plaintiff ever sought to change this address in writing.

**3.** In plaintiff's affidavit requested by the Court for jurisdictional purposes, he states that he did receive mail at the District of Columbia address from February 1979 to October 1986 during which time he owned the property at 4511 Argyle Terrace, N.W.

**4.** Section 8.2 of plaintiff's employment contract provides in relevant part: "Within fifteen (15) days following delivery of a termination notice by you or Company [defendant], or upon the

date of termination of your employment, whichever first occurs, you will personally deliver to Senior Management of Company a complete and detailed list of completed, uncompleted, pending or proposed Brokerage Activities with respect to which you seek or will seek to receive a share of Commission received or to be received by Company ... You *shall not under any circumstances* ever be entitled to share in any Commissions received by Company subsequent to the termination of this Employment Agreement if they relate to a transaction or activity which was not on the aforesaid list." (emphasis the Court's).

that since the sale of St. Cecilia's occurred more than 120 days after the termination of plaintiff's employment, plaintiff is not entitled to recovery under the contract even if he had prepared a transaction list.[5] Finally, the defendant maintains that this dispute has already been resolved by intra-company arbitration, which is provided for under the employment contract.[6] The arbitrators held that plaintiff was not entitled to a commission, because of his failure to submit a transaction list. Pursuant to the employment contract the arbitration is binding.[7]

Plaintiff's response offers two bases in support of recovery based on breach of contract in this case. First, plaintiff contends that defendant breached the contract in that the notice of termination was not provided according to the terms of the contract. Second, plaintiff relies on certain oral representations made by an employee of the defendant indicating that plaintiff would be paid the commission at issue. The Court finds these arguments to be unpersuasive on the facts of this case.

## II

■ The employment agreement in this case is a written document that established an employment at will contract which was terminable by either party for any reason. Paragraph 15 of the contract provides that all notices including those relating to termination were to be "... in writing served either personally or by certified mail, re-turn receipt requested, at the respective addresses set forth on the first page of this Employment Agreement." Based on the record in this case, the Court cannot conclude that the defendant breached the notice requirement under the employment agreement. Not only did defendant comply with the notice requirement as it relates to the address given by plaintiff on the agreement but it sent a second notice to him at his actual location in Delaware. Plaintiff admits that he received the copy of the notice. The fact that plaintiff did not claim a certified letter sent to him at a residence owned by him and where he received mail does not mean that defendant did not comply with the notice requirements set out by the contract, particularly when this is the address plaintiff furnished on the employment agreement.

■ Plaintiff's second contention is that he relied upon the statements of defendant's employee and because of that misleading conduct by defendant, it should be estopped from invoking the terms of the contract to bar his recovery. The record reflects that plaintiff took no action for an unspecified period of time following his receipt of the employment termination letter.[8] Further, he stated in his deposition that he "didn't think it was necessary" to file a transaction list. Dep. at 70. At no time did plaintiff consult the employment contract to refer to its terms regarding commissions. *Id.* at 69–70.

5. Section 8.2 provides in relevant part: "If any transaction or activity on such list is reduced to a written agreement between the parties involved prior to the termination of this agreement between the parties involved prior to the termination of this agreement or within one hundred twenty (120) days thereafter, you shall be entitled to share in Net Commissions as and when received by the Company with respect to such transaction or activity, subject to the other provisions of this Employment Agreement. If no such written agreement is entered into within said time period, you shall *not* be entitled to any share of Commission received by the Company with respect to such transaction or activity ..." (emphasis in original).

6. Section 5.2 provides in relevant part: "...Should any dispute or litigation arise between you and other employees or representa-tive of Merrill Lynch or between you and other licensed real estate brokers or salespersons, Senior Management of Company shall have the right to determine (adjudicate) the dispute or litigation and any such determination (adjudication) shall be binding upon you ..."

7. Although plaintiff admits that he was aware of the date and subject-matter of the arbitration proceedings subsequent to his termination, he did not attend. He contends that he did not participate because George Dewey indicated that his presence was unnecessary. Plaintiff's Dep. at 18, 62–3.

8. Upon receiving the termination letter plaintiff states in his deposition: "I don't know that I did anything right away. I periodically call George Dewey."

Mr. Chancellor's descriptions of his conversations with Mr. Dewey, indicate that these conversations were of an informal and unofficial nature since Mr. Dewey was unable to speak freely. Moreover, he states that he initiated the contacts with Mr. Dewey. Plaintiff does not represent that Mr. Dewey told him that there was no need to file a transaction list or that he did not need to comply with the terms of the employment agreement. Finally, there is no indication that Mr. Dewey misled plaintiff regarding the effect of the arbitration.

■ This plaintiff makes no allegation that the agreement was legally defective or ambiguous and he states that he intended to be bound by its terms. *Id.* at 69. The contract provides that a former employee has fifteen days in which to file a transaction statement and that any changes to the contract must be added in writing and signed by both parties.[9] Mr. Chancellor failed to take any steps to comply with the contract. The law is clear that when parties to a contract have reduced their entire agreement to writing, the court will disregard and treat as inoperative parol evidence of oral agreements. *United States v. Sears, Roebuck and Co.,* 623 F.Supp. 7, 8 (D.D.C.1984). In examining the contract in this case, the Court concludes that it constitutes a fully integrated contract, therefore any oral statements made by either party are inoperative on these facts.

Moreover, notwithstanding any oral representations made by George Dewey, Mr. Chancellor chose not to attend an arbitration regarding the very commission which he sought knowing that it was requested by the employee with whom plaintiff was to share the commission. According to plaintiff, Mr. Dewey informed him of the date and nature of the arbitration. Dep. at 73–4. He was aware that he would be bound by the arbitration. *Id.* Further, he was subsequently informed that the arbitration went against him because he had failed to submit a transaction or pending

deals list. *Id.* at 65. Based on the March 16, 1984 letter, plaintiff was to receive a commission in the amount of one half of 25% of the listing commission on St. Cecilia's, but, in order to receive these funds *after* his termination from the defendant's employ he had to submit a transaction list. Plaintiff admits that he never presented such a list. His right to any commission was governed by the terms of the contract, and the record fully supports the conclusion that plaintiff did not reserve his right to the funds under the terms of the contract.

■ Plaintiff's second theory of recovery in this case is quantum meruit. In this jurisdiction, one cannot recover under quantum meruit when compensation of the parties is covered by a written contract. *Standley v. Egbert,* 267 A.2d 365, 368 (D.C. 1970) (quantum meruit recovery may not be had when compensation of the parties is covered by express written contract); *Leba v. Sills,* 175 A.2d 599, 600 (D.C.1961) (it has consistently been held that a plaintiff cannot claim or recover on a quantum meruit theory when the rights of the parties and the basis of compensation are covered by a special contract). Here there is clearly a written agreement outlining plaintiff's compensation including circumstances in which he would not be paid. Contrary to plaintiff's arguments, there is no indication that the defendant breached this contract, therefore plaintiff is bound by the contract which bars payment on these facts.

Under Fed.R.Civ.P. 56(e), a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations and denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial. *See also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This burden requires the nonmoving party facing a motion under Rule 56 to introduce "significant, probative evi-

---

9. Paragraph 14 of the contract provides: This Employment agreement contains the entire understanding between you and Company concerning the matter of your employment by Company, it supersedes all other under-

standings and any changes, alteration or modification of this Employment Agreement, or the agreement contained in or the relationship created thereby, must be made in writing and signed by both you and Company.

dence tending to support the complaint". *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1598, 20 L.Ed.2d 569 (1968). In view of the record in this case, the Court concludes that since there is no genuine issue for trial, defendant is entitled to summary judgment.